UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

QUICKEN LOANS, INC.,

                Plaintiff,

v.

FRED GARCON; REACH THE
AMERICAN DREAM, INC.; and
NERLANDE FENELUS,

                Defendants.

_____/

Case No. 17-11349

Paul D. Borman
United States District Judge

Anthony P. Patti
United States Magistrate Judge

## OPINION AND ORDER:
## (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 34); AND
## (2) DENYING DEFENDANTS' MOTION TO COMPEL (ECF NO. 42)

In this diversity-jurisdiction action for breach of contract and fraud, Plaintiff Quicken Loans, Inc. ("**Quicken Loans**") alleges that Defendant Reach the American Dream, Inc. ("**RAD**") and two of its owners made misrepresentations to Plaintiff in applications for mortgage loans. Plaintiff then alleges that when it reported those misrepresentations to third-party investors to whom it had sold four of those loans, Plaintiff was legally obligated to repurchase the loans, resulting in damages.

Plaintiff has moved for summary judgment, and Defendant Garcon has filed a Motion to Compel seeking an order requiring Plaintiff to disclose certain specified documents. For the reasons stated below, Plaintiff's Motion for Summary Judgment will be granted, and Defendant Garcon's Motion to Compel will be denied.

# I.   BACKGROUND

## A.   Factual Background

### 1.   The parties

Quicken Loans is a Michigan mortgage lender with its principal place of business in Detroit, Michigan. (ECF No. 21, Am. Compl. ¶ 2.) Defendant Reach the American Dream, Inc. is a Florida corporation with its principal place of business in Lake Worth, Florida. (Am. Compl. ¶ 3; ECF No. 22, Answer ¶ 3.) Defendant Nerlande Fenelus is an owner of RAD. (Am. Compl. ¶ 10; Answer ¶ 10.) Defendant Fred Garcon is an owner, officer, and resident agent of RAD. (Am. Compl. ¶ 11; Answer ¶ 11.) Both Fenelus and Garcon are citizens of Florida. (Am. Compl. ¶¶ 4-5; Answer ¶¶ 4-5.)

### 2.   The Broker Agreement

In or around May 2014, Quicken Loans and RAD entered into a Broker Agreement. (ECF No. 34, Pl.'s Mot. Ex. A, Broker Agreement.) Through the Broker Agreement, the parties intended "to establish a non-exclusive relationship whereby Broker [i.e., RAD] will perform origination services and submit loan application packages . . . for first and second lien 1-4 family residential mortgage financing on behalf of Broker's customers . . . to Lender [i.e., Quicken Loans] for loan approval determination and possible funding by Lender." (*Id.* at 1, Pg ID 199.) Among the services that RAD agreed to perform for each loan was "collecting financial

2

information (e.g., tax returns, bank statements) and other related documents that are part of the application process." (*Id.* at 2, Pg ID 200.)

Section 4.7 of the Broker Agreement provides in relevant part:

**FRAUD**. Broker shall not submit any Application or related documents containing false or misrepresented information. Broker shall be responsible for all actions taken in the course of its performance of its obligations under this Agreement, whether performed by Broker, its employees or licensees, or the Applicant, or any other third party involved in the origination of the mortgage loan.

(*Id.* at 8, Pg ID 206 (emphasis in original).)

Additionally, Section 4.8 of the Broker Agreement provides:

**NO UNTRUE OR MISLEADING STATEMENTS**. No representation, warranty or written statement made by Broker to Lender in this Agreement or in any schedule, written statement or document furnished to Lender in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

(*Id.* (emphasis in original).)

Section 6 of the Broker Agreement sets forth Plaintiff's remedies in the event of breach. (*See id.* at 10-11, Pg ID 208-09.) Specifically, Section 6 provides that from the time at which RAD discovers or is notified of any breach of the Broker Agreement, RAD shall have 30 days to cure such breach "to the reasonable satisfaction of Lender." (*Id.* at 11, Pg ID 209.) For any breach that Plaintiff determines cannot be cured, however, Section 6 provides that "Lender may demand

3

and Broker shall be required to repurchase in all material respects said loan from

Lender or the investor to whom Lender sold the loan for the 'Repurchase Price.'"

(*Id.*) Section 6 then defines "Repurchase Price" as follows:

> The Repurchase Price shall be an amount equal to the sum of (i) the
> current unpaid principal balance of the loan at the time of repurchase
> (or at the time of the foreclosure sale date if the related loan has been
> foreclosed), (ii) accrued but unpaid interest on such principal balance
> at the Note rate from the paid-to date of the loan through and including
> the last day of the month in which the Repurchase Price is paid, (iii) all
> costs and expenses, including without limitation, reasonable attorneys'
> fees and expenses, incurred by Lender as a result of Broker's breach of
> this Agreement or enforcing the terms of this Agreement or Broker's
> obligation to repurchase the loan, (iv) any premium paid by Lender in
> excess of the principal balance of the loan at the time of purchase if
> Lender has not sold the loan at the time of Broker's repurchase or if
> Lender has sold the loan and it is required to reimburse the purchaser,
> the premium that the purchaser paid to Lender, (v) any unreimbursed
> advances made by Lender, including without limitation taxes or
> insurance or payments authorized by the Note or the mortgage or
> applicable law to protect Lender's interest in the loan or related property
> and (vi) any other fees, costs or amounts relating thereto.

(*Id.*)

Finally, Section 10.12 of the Broker Agreement contains choice-of-law and

venue provisions:

> **GOVERNING LAW; JURISDICTION**. This Agreement shall be
> governed by, and construed and enforced in accordance with,
> applicable federal law and the laws of the State of Michigan. Any action
> arising out of this Agreement or the transactions contemplated hereby
> may be instituted in any state or federal court located in the State of

Michigan. Further, each party expressly waives any objection which such party may have to the laying of venue of any such action, and irrevocably submits to the jurisdiction of any such court and agrees to be fully bound by any final unappealed decision of those courts.

(*Id.* at 16, Pg ID 214 (emphasis in original).)

### 3.    Three loans funded by Plaintiff based on "6912 Account" statement

In July 2014, RAD submitted a residential mortgage loan application to Plaintiff on behalf of a borrower identified as "Fenel Simon." Defendants admit that as part of the underwriting process for that loan, RAD "submitted a bank statement allegedly from Wells Fargo for a customer named Fenel Simon with account number ending in 6912 ('the 6912 Account')." (Am. Compl. ¶ 13; Answer ¶ 13.) Plaintiff alleges that because the bank statement "on its face looked altered, [Plaintiff] sent a verification of deposit to Wells Fargo regarding the 6912 Account." (Am. Compl. ¶ 14.) Wells Fargo responded on September 19, 2014 that it could not in fact complete Plaintiff's "Verification of Deposit request," and stated the following reason: "ACCOUNT NUMBER PROVIDED AND CUSTOMER NAME PROVIDED DO NOT MATCH. CUSTOMER IS NOT AN AUTHORIZED SIGNER ON THE ACCOUNT PROVIDED." (Pl.'s Mot. Ex. D, Wells Fargo Response.) Plaintiff alleges that after investigating the matter, it determined that "[t]he names listed on page 2 of the Fenel Simon bank statement are Nerlande Rodney, an alias for Nerlande Fenelus, . . . and, upon information and belief, Nerlande's mother, Silenne

Rodney." (Am. Compl. ¶ 16a.)

Defendants admit that "RAD submitted the altered 6912 Account statement that was false and was not the statement of an account owned by the borrower for the prospective mortgage loans." (Am. Compl. ¶ 39; Answer ¶ 39.) Defendants also admit that Defendant Garcon "was personally involved in the submission of the Applications and other documents to Quicken Loans for these loans including the submission of the 6912 Account statement." (Am. Compl. ¶ 41; Answer ¶ 41.) In their September 15, 2017 response to Plaintiff's first set of discovery requests, Defendants indicated both that Defendant Garcon altered the 6912 Account statement, and that he submitted it to Plaintiff as part of the underwriting process for ten separate loan applications—including the three loans that Plaintiff had already funded before discovering the misrepresentation, which are further discussed below. (*See* Pl.'s Mot. Ex. E, Discovery Responses at Pg ID 271-75.)

Plaintiff alleges that after it discovered RAD's use of the altered bank statement, it denied funding for the loan application filed on behalf of "Fenel Simon," and that it also denied funding for six other loan applications for which RAD had used the same altered bank statement, but that it had already funded three other loans based on the altered statement. Those three loans were to individuals named Evans, Francois, and Monestime respectively. (Am. Compl. ¶¶ 17-19.)

6

### 4.   Loan funded by Plaintiff for "Maggy Leroy"

In addition to the three loans funded on the basis of the altered bank statement, Plaintiff's claims also arise from a fourth loan funded on the basis of an entirely different misrepresentation. Sometime in 2014, Plaintiff funded a loan in an unspecified amount to a "Maggy Leroy." That loan was funded in part based on representations by Fenelus that Leroy was her sibling, and that she had made a gift to Leroy of $17,500. These representations were made in a "Gift Letter" apparently signed by Fenelus. (Pl.'s Mot. Ex. F, Gift Letter.)

In a letter to Fenelus and RAD dated October 31, 2014, Kristen Broadley, Plaintiff's Director of Loss Mitigation, stated:

> In a post-close audit, we recently discovered the following issue wi1h this loan file:
> - An investigation revealed that the donor on the gift letter was from the owner of Reach the American Dream, Inc. and the client was a sibling of the owner. However, our research indicates that there are no relative traces or evidence to support this relationship.
>
> Our contract requires us to give you prompt notice of defects in loan files, so that's what we are doing.

(Pl.'s Mot. Ex. G, October 2014 Letter.) Broadley's letter also requested that Fenelus and RAD send any information they had that might cure the defect within 30 days, and that RAD return to Plaintiff the "compensation received on the subject loan," which the letter identified as $1,828.33. (*Id.*) Plaintiff alleges that Defendants never responded to this letter or otherwise corrected the defect. (Am. Compl. ¶ 23.)

7

In their September 15, 2017 response to Plaintiff's first set of discovery requests, Defendants admitted that Leroy and Fenelus were not in fact siblings. (*See* Discovery Responses at Pg ID 275.)

### 5.    Plaintiff's claimed damages

Plaintiff's claims thus concern four loans in total: the three loans that Plaintiff funded based on the altered 6912 Account statement (i.e., the Evans, Francois, and Monestime loans), and the loan to "Maggy Leroy" that Plaintiff funded based in part on Nerlande's representation that Leroy was her sibling. Plaintiff asserts that it sold three of these loans to the Federal National Mortgage Association ("**Fannie Mae**") and one to the Federal Home Loan Mortgage Corporation ("**Freddie Mac**") (collectively, the "**Investors**"); that Plaintiff was later obligated to repurchase the loans from the Investors after disclosing to them the misrepresentations that Defendants had made; and that Plaintiff subsequently mitigated its damages by reselling the loans to a different company called Goshen Mortgage.

Although the general factual basis for Plaintiff's damages is clear enough, the evidence that Plaintiff submitted as exhibits to its Motion for Summary Judgment was insufficient to prove those damages in any particular amount. This evidence consisted principally of charts and other documents that were untitled, unexplained, and in some cases unreadable, and which led in some instances to inconsistent calculations of different facets of Plaintiff's damages. The Court explained these

8

deficiencies to Plaintiff's counsel at the May 3, 2018 hearing on Plaintiff's Motion for Summary Judgment and required Plaintiff to file a supplemental brief that contained an adequate explanation of the evidence of Plaintiff's damages. Plaintiff complied, and the following summary is derived both from Plaintiff's supplemental brief (ECF No. 43, Pl.'s Supp. Br.) and from the exhibits attached to Plaintiff's underlying summary judgment motion.

The damages Plaintiff seeks in this lawsuit include: (1) the difference between what it paid to repurchase the loans from the Investors and what it received in reselling them to Goshen Mortgage as mitigation of damages, minus any other sums recovered from Defendants; (2) a "yield spread premium" (i.e., commissions) that Defendants were paid as compensation for originating these loans; and (3) reasonable attorneys' fees and expenses. (Pl.'s Mot. at 8, Pg ID 195.)

Plaintiff's evidence suggests that Plaintiff repurchased the Evans loan from Freddie Mac for $270,368.71 (Pl.'s Mot. Ex. H at Pg ID 285-86), and that Plaintiff repurchased the Leroy, Francois, and Monestime loans from Fannie Mae for $98,340.74, $69,332.90, and $79,569.68 respectively (*id.* at Pg ID 287-92), for a total repurchase amount of $517,612.03. Plaintiff's evidence also indicates that the amount Plaintiff received from selling the four loans to Goshen Mortgage in mitigation of its damages was $387,469.81. (Pl.'s Mot. Ex. I at Pg ID 299-303; Pl.'s Supp. Br. Ex. 2.) Finally, Plaintiff represents that in the time between its repurchase

9

of the loans from the Investors and its resale of the loans to Goshen Mortgage, Plaintiff "collected $4,645.26 from [Defendants] in monthly mortgage payments."[1] (Pl.'s Supp. Br. at 5, Pg ID 347.) Defendants have not disputed any of these calculations, or submitted countervailing evidence. Thus, record evidence reflects that Plaintiff's damages from the repurchase and resale of the loans was $125,496.96, representing the repayment amount ($517,612.03), less the mitigation amount ($387,469.81) and the amount collected from Defendants ($4,645.26).

As to the yield spread premium that Defendants received for originating the four loans, the record indicates (and again, Defendants do not dispute) that the yield spread premium amounts paid were $1,828.33 for the Leroy loan, $1,938.77 for the Francois loan, $ 1,107.13 for the Monestime loan, and $8,557.75 for the Evans loan, totaling $13,431.98. (Pl.'s Mot. Ex. J.)

Finally, Plaintiff claims that pursuant to the Broker Agreement, its damages must include reasonable attorneys' fees and costs; Plaintiff argues that such fees and costs total $33,374.74 in this case, and has submitted billing records in support of this figure. (Pl.'s Mot. Ex. K; Pl.'s Supp. Br. Ex. 2.)

---

[1] Plaintiff has offered no evidence, even now, supporting the factual assertion that Defendants paid Plaintiff $4,645.26 in mortgage payments between the repurchase and resale dates. However, since Defendants have not specifically disputed the assertion, and since the effect of it is to reduce Plaintiff's damages, the Court will construe Plaintiff's statement regarding the $4,645.26 in mortgage payments from Defendants as a stipulation by Plaintiff, and factor it into the damages calculus.

Thus, Plaintiff's claimed damages, which include $125,496.96 in partially mitigated compensatory damages for the loan repurchases, $13,431.98 in compensatory damages for the yield spread premiums paid, and $33,374.74 in attorneys' fees and costs, come to a grand total of $172,303.68.

## B.    Procedural History

Plaintiff filed the initial complaint in this action on April 27, 2017. (ECF No. 1, Compl.) Defendants, then represented by counsel, answered the complaint on June 19, 2017. (ECF No. 11.) Pursuant to a Stipulated Order (ECF No. 20), Plaintiff filed an Amended Complaint (now the operative complaint in this action) on September 7, 2017. (ECF No. 21, Am. Compl.) Defendants answered on September 26, 2017. (ECF No. 22, Answer.) A Scheduling Order entered on September 5, 2017 set the fact discovery cutoff date at November 30, 2017, and the dispositive motion deadline at April 6, 2018. (ECF No. 18, Scheduling Order.)

On October 2, 2017, Defendants' attorney moved to withdraw as counsel. (ECF No. 25.) This Court held a hearing on that motion on October 16, 2017, and Defendant Garcon (appearing by telephone) confirmed that he had informed his attorneys that their services were no longer necessary, and that this was because Defendants were unable to afford continued legal representation. The Court granted Defendants' counsel's motion to withdraw the following day. (ECF No. 31.)

Then, on November 13, 2017, the Court issued an Order Regarding Legal

11

Representation of Defendant Reach the American Dream, Inc. (ECF No. 33.) In that

Order, the Court cited the principle "that a corporation may appear in the federal

courts only through licensed counsel." (*Id.* at 1, Pg ID 181 (internal quotation marks

omitted) (quoting *In re Iron Workers Local 25 Pension Fund*, 811 F. Supp. 2d 1295,

1318 (E.D. Mich. 2011)).) The Court then stated that it would not be appointing

counsel to represent RAD, and that "in the event that licensed counsel is not secured

to represent any of the Defendants in this action, the case will proceed with

individual Defendants Garcon and Fenelus representing themselves, and Defendant

Reach the American Dream, Inc. will be unrepresented." (*Id.* at 1-2, Pg ID 181-82.)

Plaintiff filed the instant Motion for Summary Judgment on February 1, 2018.

(ECF No. 34, Pl.'s Mot.) On February 22, 2018, Defendant Garcon submitted a filing

called "Defendants' Motion for Court to Deny Plaintif [*sic*] Motion for Summary of

Judgement." (ECF No. 37, Def.'s Resp.) On April 9, 2018, Plaintiff filed a Reply

(ECF No. 38, Pl.'s Reply) that was timely under the briefing schedule that the Court

had previously issued (ECF No. 35).

Then, on April 27, 2018, Defendant Fenelus submitted an untimely and

unauthorized sur-reply brief also entitled "Defendants' Motion for Court to Deny

Plaintif [*sic*] Motion for Summary of Judgement." (ECF No. 40.) In that filing,

Fenelus asserted that she "never signed a contract on . . . behalf of Reach the

American Dream with Quicken [Loans]," that she "never signed any gift letter," that

she had no knowledge of either of these two documents, and that she had no knowledge of "[s]ubmission of any loan file to Quicken [Loans]." (*Id.* at 1-2, Pg ID 335-36.) The filing was signed by Fenelus, and notarized by a Florida notary, on April 24, 2018. (*Id.* at 2, Pg ID 336.)

Indeed, Defendants Garcon and Fenelus submitted a second untimely and unauthorized sur-reply brief on April 27, 2018, entitled "Defendants' Reply Brief in Support of Motion for Court to Deny Plaintif [*sic*] Motion for Summary of Judgement" (ECF No. 41), which reiterated Fenelus's claim "that she had no involvement nor any . . . knowledge of either Fred Garcon or Reach The American Dream Inc business practices." (Id. at 2, Pg ID 338.) That filing then proceeded to set forth Defendants' specific arguments regarding the dispute:

> Another fact in dispute is the calculation of the amount that Plaintiff claims for judgment. Even after numerous requests through the discovery process Plaintiff failed to provide documents to the court nor defendants that show the exact amount that the loans were first sold for at the initial sale to the secondary market. For the court to grant the judgment to Plaintiffs; Plaintiff must demonstrate **the amount that the loans were sold initially to the secondary market.** Quicken loan must also disclose the amount of interest payment, servicing fees and any income received while holding the assets in their portfolio and from the buying and selling of the assets in questions.

(*Id.* (emphasis in original).) This filing was signed by both Defendant Garcon and Defendant Fenelus, but unlike the other filing made that day, it was not notarized.

(*Id.*) Thus, both individual Defendants, Garcon and Fenelus, were actively litigating this case, and discussing Plaintiff's business practices, albeit with untimely motions.

The Court held a hearing on Plaintiff's Motion for Summary Judgment on Thursday, May 3, 2018, at which Plaintiff was represented by counsel and Defendant Garcon appeared on behalf of himself. No counsel appeared for RAD or for Fenelus. The Court explained on the record at the May 3, 2018 hearing that because he was not a licensed attorney, Defendant Garcon was not permitted to represent either Defendant RAD or Defendant Fenelus. After hearing argument from both Plaintiff's counsel and from Defendant Garcon, the Court took Plaintiff's Motion for Summary Judgment under advisement.

On the same day as the May 3, 2018 hearing, the Court received a filing entitled "Defendants' Motion to Compel," which was signed by Defendant Garcon. (ECF No. 42.) In that filing, Defendant Garcon argued that Plaintiff's responses to Defendant's discovery requests had been due on July 19, 2017, and that "[t]o date the response provided does not contain enough evidence to prove Plaintiff's claim." (*Id.* at 1, Pg ID 341.) Defendant Garcon then asserted that in an October 25, 2017 email to Plaintiff's counsel, Defendants stated as follows:

> a. - Still there may questions to be answered to obtain an exact picture
> of the final numbers. Plaintiffs to provide evidence for the following:
> b. Evidence of the exact amount that Plaintiff sold these loans to
> Goshen Mortgage LLC (right now all we have is claimed with no proof

of the exact sale amount (Contract provided by Plaintiff does evidence
of agreed amount between the two parties)
c. Quicken loan to disclose the amount of money earned from yield
spread, underwriting fee and processing fee on or before closing.
(Including but not limited back-end interest rate premium charged to
borrower at the time the loans were locked)
d. Quicken loan to disclose any post closing income earned from the
file in question such as interest, late fees, servicing fees and any other
fees .....
e. Evidence of how much the loan were sold to Fannie Mae
f. Evidence of when the loan were sold to Fannie Mae

(*Id.* at 2, Pg ID 342.) Defendant Garcon argued that Defendants had not received

satisfactory responses to their discovery requests, and that Plaintiff's counsel

responded to Defendants' email on October 31, 2017 stating that "some of the

documents requested are not relevant," and accordingly requested an order by this

Court compelling Plaintiff to respond to Defendants' discovery request. (*Id.*)

On May 8, 2018, Plaintiff filed a Supplemental Brief Regarding Damages, in

compliance with this Court's order as stated on the record at the May 2, 2018

hearing. (ECF No. 43, Pl.'s Supp. Br.) Then, on May 17, 2018, Plaintiff filed a

Response to Defendant Garcon's Motion to Compel, arguing that Plaintiff had

provided all relevant documents to Defendants and that Defendant Garcon's Motion

was untimely, but also asserting that "the only remaining documents that Plaintiff

seeks to compel - even though they are irrelevant - will be produced to avoid arguing

over any of the disputed documents." (*Id.* at 2, Pg ID 361.)

As this matter is ripe for adjudication, the Court now issues the following ruling.

## II.    LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v.*

*Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

### III.    DISCUSSION

Based on Plaintiff's evidence as well as Defendants' admissions, and given that Defendants have not submitted any evidence in opposition to Plaintiff's Motion, the evidence in the record warrants an entry of summary judgment in Plaintiff's favor. Specifically, Plaintiff is entitled to summary judgment against Defendant RAD on all claims; against Defendant Garcon on the fraud and silent fraud claims as to the Evans, Francois, and Monestime loans; and against Defendant Fenelus as

to the Leroy loan.

## A.    Plaintiff's Motion for Summary Judgment

### 1.    Liability

#### a) Breach of Contract (Count I)

Plaintiff's claim for breach of contract is asserted against Defendant RAD only. Plaintiff has evidenced that RAD and Plaintiff entered into the Broker Agreement, and has submitted the Broker Agreement itself as evidence of its terms. These terms include a provision that RAD "shall not submit any Application or related documents containing false or misrepresented information"; a provision that "[n]o representation, warranty or written statement made by [RAD] to [Plaintiff] . . . contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading"; and a provision that RAD "shall be responsible for all actions taken in the course of its performance of its obligations under this Agreement, whether performed by [RAD], its employees or licensees, or the Applicant, or any other third party involved in the origination of the mortgage loan." (ECF No. 34, Pl.'s Mot. Ex. A, Broker Agreement at 8, Pg ID 206.)

In addition, Defendants have admitted that Garcon was "personally involved" in the submission of the altered 6912 Account statement to Plaintiff (Answer ¶ 41), and stated more specifically in their discovery responses that Garcon in fact altered

18

and submitted the 6912 Account statement as part of the underwriting process for the Evans, Francois, and Monestime loans, among others (*see* Pl.'s Mot. Ex. E, Discovery Responses at Pg ID 271-75). Lastly, Plaintiff has proffered evidence that as part of the underwriting process for a different loan application, RAD submitted a statement bearing Fenelus's signature, which represented that Fenelus had made a gift of $17,500 to Leroy, and that Fenelus and Leroy were siblings. (*See* Pl.'s Mot. Ex. F, Gift Letter.)

Defendants, meanwhile, have admitted that Leroy and Fenelus are not in fact siblings. (*See* Discovery Responses at Pg ID 275.) Moreover, Defendants have submitted no evidence in opposition to Plaintiff's Motion for Summary Judgment. All of this is enough to warrant a finding that there are no genuine issues of material fact as to RAD's liability for breach of the Broker Agreement in connection with the Evans, Francois, Monestime, and Leroy loans.

Michigan law governs this dispute. The Broker Agreement has an express choice-of-law clause providing as much (*see* Broker Agreement at 16, Pg ID 214), and neither party has indicated that there is any reason not to enforce it. "[B]oth Michigan choice-of-law rules and general equitable choice-of-law policies support enforcing parties' agreed-upon choice-of-law clauses absent any strong public policy concerns to the contrary." *Prestige Capital Corp. v. Michigan Gage & Mfg., LLC*, 722 F. Supp. 2d 837, 843 (E.D. Mich. 2010) (quoting *Bennett v. Am. Online, Inc.*,

No. 06–13221, 2007 WL 2875169, at \*13 n. 6 (E.D. Mich. Sept. 28, 2007) (citing *In re Dow Corning Corp.*, 419 F.3d 543 (6th Cir.2005))).

"To state a breach of contract claim under Michigan law, a plaintiff must first establish the elements of a valid contract." *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citing *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765 (1990)). "The elements of a valid contract in Michigan are 1) parties competent to contract, 2) a proper subject matter, 3) a legal consideration, 4) mutuality of agreement, and 5) mutuality of obligation." *Id.* (citing *Thomas v. Leja*, 187 Mich. App. 418, 422 (1990)). "Once a valid contract has been established, a plaintiff seeking to recover on a breach of contract theory must then prove by a preponderance of the evidence the terms of the contract, that the defendant breached the terms of the contract, and that the breach[] caused the plaintiff's injury." *Id.* (citing *Platsis v. E.F. Hutton & Co., Inc.*, 642 F. Supp. 1277, 1309 (W.D. Mich. 1986)).

In the instant case, Plaintiff's evidence (chiefly the Broker Agreement itself), along with Defendants' admissions and failure to adduce countervailing evidence, permit Plaintiff to meet its summary judgment burden on liability for its breach of contract claim. There is no indication that the parties were not competent to contract or that the subject matter was somehow unlawful, and the Broker Agreement submitted by Plaintiff evidences the elements of consideration, mutuality of agreement, and mutuality of obligation. Plaintiff has also shown that RAD, which

assumes responsibility for the actions of its employees (and any third parties) under the Broker Agreement, breached the provisions concerning misrepresentations and untrue statements. Finally, Defendants admitted in their pleadings, while they were represented by counsel, that "RAD submitted the altered 6912 Account statement that was false and was not the statement of an account owned by the borrower for the prospective mortgage loans." (Answer ¶ 39.)

Based on the foregoing, the Court finds that Plaintiff is entitled to summary judgment against RAD for the breach of contract claim asserted in Count I of the Complaint.

### b) Fraud and Silent Fraud (Counts II and III)

Plaintiff's claims for Fraud (Count II) and Silent Fraud (Count III) are asserted against all three Defendants: RAD, Garcon, and Fenelus. Fraud claims under Michigan law require a plaintiff to show that:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

*Coyer v. HSBC Mortg. Servs., Inc.*, 701 F.3d 1104, 1108 (6th Cir. 2012) (quoting Bennett v. MIS Corp., 607 F.3d 1076, 1100–01 (6th Cir. 2010). "A silent fraud claim

differs from a traditional fraud claim in that the false representation needed to establish the first three elements of fraud may be shown by the defendant's failure to divulge a fact that the defendant had an affirmative duty to disclose." *Chires v. Cumulus Broad., LLC*, 543 F. Supp. 2d 712, 721 (E.D. Mich. 2008) (citing *Hord v. Environmental Research Institute of Michigan*, 228 Mich. App. 638, 646–647 (Mich. App. 1998) (dissenting opinion)).

The specific misrepresentation upon which Plaintiff's fraud claim is premised is the 6912 Account statement for the Evans, Francois, and Monestime loans, and the "gift letter"—i.e., the letter bearing Fenelus's signature, which falsely identified "Maggy Leroy" as Fenelus's sibling and stated that Fenelus had gifted $17,500 to Leroy—for the Leroy loan. These same facts underlie Plaintiff's silent fraud claim, on the theory that Defendants breached an affirmative duty to disclose what was misrepresented in the 6912 Account statement and the gift letter.

The evidence regarding Plaintiff's obligation to repurchase the Evans, Francois, Monestime, and Leroy loans from the Investors, along with the evidence of the transactions surrounding those repurchases and the subsequent resale of the four loans to Goshen Mortgage, suffice to establish the first, fifth, and sixth fraud elements respectively: materiality, reliance, and damages. Further, Defendants' admission that the 6912 Account statement was altered along with the uncontested evidence that Fenelus and Leroy are not siblings takes the second fraud element

(falsity) out of dispute. This leaves the third and fourth fraud elements of scienter and intent to induce reliance, and based on the record before this Court, the Court finds that Plaintiff has shown its entitlement to summary judgment on its fraud and silent fraud claims.

All four of the misrepresentations that underlie Plaintiff's fraud and silent fraud claims—the 6912 Account statements submitted in connection with the Evans, Francois, and Monestime loans, and the gift letter for the Leroy loan—can be imputed to Defendant RAD. The four misrepresentations were made by Garcon or Fenelus acting on behalf of RAD and pursuant to the arrangement reflected in the Broker Agreement. Plaintiff is therefore entitled to summary judgment against RAD on its fraud and silent fraud claims.

The extent of liability for each of the individual Defendants Garcon and Fenelus is based on the particular misrepresentation at issue. Between Defendants' admission that Garcon was involved in the submission of the altered 6912 Account statement, and their more specific representations in their discovery response that Garcon both altered and submitted the 6912 Account statement in connection with the applications for the Evans, Francois, and Monestime loans, Plaintiff has established that there is no genuine issue of material fact as to Garcon's liability on the fraud claims for the three loans that Plaintiff funded based on the altered 6912 Account statement. This evidence establishes that Garcon knew the statement at

23

issue was false, and the circumstances are such that a reasonable jury could only conclude that Garcon altered the 6912 Account statement for the purpose (and hence with the intent) of inducing Plaintiff's reliance. Plaintiff is entitled to summary judgment against Defendant Garcon on the fraud and silent fraud claims, but only as regards the Evans, Francois, and Monestime loans.

The misrepresentation underlying the Leroy loan was the gift letter, signed by Defendant Fenelus, which represented that Fenelus and Leroy were siblings and that Fenelus had made a $17,500 gift to Leroy—neither of which representation, it has now been established, was true. As with the 6912 Account statements altered and submitted by Defendant Garcon, the Court finds that the statements in the gift letter are sufficient that Fenelus knew the statements were false and that she made them with the intention of inducing Plaintiff's reliance. On the basis of this finding, Defendant Fenelus is liable to Plaintiff on Plaintiff's fraud claims, to the extent that Plaintiff's damages arose from the funding of the Leroy loan.[2]

---

[2] Defendant Fenelus's "Motion for Court to Deny Plaintif Motion for Summary of Judgment" (ECF No. 40), filed on April 27, 2018, does not require a different outcome, and this is for two reasons. First, this filing was an unauthorized sur-reply brief, and is therefore not properly before this Court. Second, Fenelus's statements in that filing that she had no knowledge of, and did not sign, the gift letter are not sworn statements as would constitute valid evidence in summary judgment proceedings: although the filing is notarized, the notary's statement is that Fenelus "proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are listed on the Debt Modification agreement (legal instrument) dated 04/24/2018, and personally appeared before me this day and acknowledged the due

In summary, for the reasons stated above, Plaintiff is entitled to summary judgment against Defendant RAD on all three claims asserted in this action; against Defendant Garcon on the fraud and silent fraud claims insofar as they are premised on the loans funded based on the 6912 Account statement (i.e., the Evans, Francois, and Monestime loans); and against Defendant Fenelus on the fraud and silent fraud claims insofar as they are premised on the Leroy loan.

## 2.   Damages

Plaintiff's proof of damages was submitted via exhibits to its Motion for Summary Judgment, and further explicated at the Court's direction in Plaintiff's Supplemental Brief, and that evidence of damages is summarized above. The evidence is sufficient to establish that Plaintiff is entitled to damages of $125,496.96 in partially mitigated compensatory damages for the loan repurchases, and $13,431.98 in compensatory damages for the yield spread premiums paid.

Plaintiff has also requested attorneys' fees and costs in the amount of $33,374.74. "In a diversity action such as this, when considering an award of attorney's fees, the Court must apply state substantive law and federal procedural law." *Hunt v. Hadden*, 159 F. Supp. 3d 800, 805 (E.D. Mich.) (citing *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 528 (6th Cir. 2002)),

---

execution of the aforementioned legal instrument." (ECF No. 40 at 2, Pg ID 336.) There is no indication that Fenelus's statements in this filing were sworn statements.

*aff'd*, 665 F. App'x 435 (6th Cir. 2016). Under Michigan substantive law, "the parties to an agreement may include within the agreement a provision respecting the payment of attorney fees, which courts will enforce like any other term unless contrary to public policy." *Pransky v. Falcon Grp., Inc.*, 311 Mich. App. 164, 194 (2015) (citing *Fleet Business Credit, LLC v. Krapohl Ford Lincoln Mercury Co.*, 274 Mich. App. 584, 589 (2007)). As a procedural matter, Federal Rule of Civil Procedure 54(d) "states that requests for attorney's fees must be made by motion, which must 'specify the judgment and the statute, rule, or other grounds entitling the movant to the award.'" *Hunt*, 159 F. Supp. 3d at 805 (quoting Fed. R. Civ. P. 54(d)(2)(B)(ii)).

Here, although Plaintiff has provided the Court with an accounting of the number of hours expended and the hourly rate charged, more is required, as a matter of procedure, for the award of fees Plaintiff seeks. *See Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 989 F.2d 213, 221 (6th Cir. 1993) (observing in a diversity action that "[g]enerally, an inquiry into the reasonableness of attorneys' fees involves a determination of the suitability of the number of hours expended and an analysis of the propriety of the hourly fee charged") (citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983)). Plaintiff has not provided this Court with any argument or evidence tending to establish a basis for determining the suitability of the time expended or the propriety of the hourly fee charged. Further, it is unclear that the

26

fees assessed for the preparation of Plaintiff's Supplemental Brief Regarding Damages (ECF No. 43) would constitute "reasonable fees" in this case, since that supplemental filing was only necessitated by Plaintiff's counsel's inadequate evidentiary showing in the first instance. The Court finds that an award of attorneys' fees is not warranted at this time.

**B.    Defendant Garcon's Motion to Compel**

Plaintiff correctly points out that Defendant Garcon's Motion to Compel is untimely by virtue of its having been filed approximately five months after the close of discovery. Even making an allowance for Defendant Garcon's status as a *pro se* litigant, however, the Court finds that Defendant Garcon's Motion to Compel lacks merit. Plaintiff has proffered evidence that sufficiently establishes each of the elements of its claims, subject to the limitations discussed above. The materials that Defendant Garcon seeks to compel Plaintiff to produce—assuming that Plaintiff has not held to its representation that it would produce the documents "to avoid arguing about this issue" (ECF No. 44 at 3, Pg ID 362)—do not appear to relate to the reasons for which the Court finds that Plaintiff is entitled to summary judgment. Accordingly, Defendant Garcon's Motion to Compel will be denied.

### IV.    CONCLUSION

For the reasons stated above, it is hereby ORDERED that Plaintiff Quicken Loans' Motion for Summary Judgment against Defendants RAD, Garcon, and

Fenelus (ECF No. 34) is GRANTED. Defendant Garcon's Motion to Compel (ECF No. 42) is DENIED. Plaintiff shall recover from Defendant Reach the American Dream, Inc., Defendant Garcon, and Defendant Fenelus, jointly and severally, the sum of $125,496.96 in compensatory damages arising from repurchased loans, and $13,431.98 in compensatory damages for yield spread premiums paid to Defendants, for a total judgment of $138,928.94.

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

Dated: SEP 0 4 2018

28